IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

MORGAN STANLEY SMITH
BARNEY LLC,

      Plaintiff,

v.

DAVID JAMES SAYLER,

      Defendant.

Case No. 1:19-cv-01067-AA
**OPINION & ORDER**

AIKEN, District Judge:

This matter comes before the Court to determine if the Temporary Restraining Order ("TRO") granted to Plaintiff Morgan Stanley Smith Barney LLC ("Morgan Stanley") should continue as a preliminary injunction. Oral argument was held on July 19, 2019. ECF No. 19. For the reasons set forth below, the motion for continuing injunctive relief is DENIED and the previously-issued injunction is hereby dissolved.

\ \ \

\ \ \

\ \ \

## LEGAL STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) an injunction is in the public interest. *Id.* at 20.

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

## BACKGROUND

Morgan Stanley is a Delaware LLC with its principal place of business in New York. Morgan Stanley is a broker-dealer and a member of the Financial Industry

Regulatory Authority, Inc. ("FINRA"). Morgan Stanley conducts its business through offices nationwide, including an office in Medford, Oregon.

In 2006, Defendant David James Sayler ("Sayler") began working for Morgan Stanley, or its predecessor, as a financial advisor in Medford, Oregon. Sayler resigned from his position with Morgan Stanley on June 13, 2019 to take a position with one of Morgan Stanley's competitors.

In 2016, Sayler joined the Cedar Ridge Group (the "Group"), a joint production group based out of Morgan Stanley's Medford branch office. As part of the Group, Sayler was compensated based on the revenue generated by the entire team, rather than the revenue generated by the accounts he directly serviced. "As a result, [Sayler] was paid almost 15% more than he would have if he had not become part of the team." Compl. ¶ 6.

In 2017, another member of the Group, James Maddux, retired. On his retirement, Maddux entered the Former Advisor Program ("FAP"), under which Maddux agreed to encourage his clients to remain with Morgan Stanley after his departure. Maddux's accounts would be serviced by active Morgan Stanley financial advisors and, in exchange, Maddux would receive a portion of the revenue generated by his former accounts.

On August 2, 2017, Sayler signed a memorandum of understanding (the "2017 Agreement"), by which he agreed to serve as an active advisor for some of the Maddux accounts through the FAP. Compl. Ex. B. These included accounts previously serviced under Joint Production Number 173-035 (the "173-035 Accounts"). As an

active advisor on the Maddux accounts, Sayler agreed that the client information associated with those accounts was "highly confidential, proprietary and the property of Morgan Stanley," and that "the misuse or misappropriation of such information would be of immeasurable loss and detriment to Morgan Stanley." Compl. Ex. B, at 3. Sayler agreed that, if his employment with Morgan Stanley was suspended or terminated, he would immediately stop using the Maddux account information and that he would immediately deliver that information to Morgan Stanley, without retaining any of it. Sayler also agreed that, in the event of termination, for any reason,

> [F]or a period of one year or the remainder of the Payment Period, whichever is longer, you will not solicit or attempt to solicit, directly or indirectly, any of the Clients who were served by you or any other Active Advisor in connection with this FAP Agreement, or whose names became known to you in connection with this FAP Agreement, while in the employ of Morgan Stanley or as a result of your employment with Morgan Stanley, with respect to securities, commodities, financial futures, insurance, tax advantages investments, mutual funds, or any other line of business in which Morgan Stanley or any of its affiliates is engaged.

Compl. Ex. B, at 3.

As part of the 2017 Agreement, Sayler agreed that Morgan Stanley was entitled to seek injunctive relief in the event of a breach. Compl. Ex. B, at 3-4. Sayler further agreed that any dispute over the 2017 Agreement would be resolved by FINRA arbitration.

In April 2019, Sayler became dissatisfied with his participation in the Group. Sayler Decl. Sayler decided to leave the Group, but remain with Morgan Stanley as a financial advisor. On April 22, 2019, Sayler and two other advisors signed the

Page 4 – OPINION AND ORDER

Morgan Stanley Wealth Management Former Advisor Program Joint Active Advisor Agreement (the "2019 Agreement"). Compl. Ex. C.

As with the 2017 Agreement, the 2019 Agreement was concerned with protecting the Maddux's retirement income. It memorialized that Sayler would serve as the lead active advisor on the 173-035 Accounts and would receive 74.67% of the revenue generated by those accounts, which would increase annually until 2022, when Sayler would receive 75% of the revenue generated by the 173-035 Accounts. Compl. Ex. C, at 1-2. The 2019 Agreement included terms covering confidentiality and non-solicitation of clients identical to those set forth in the 2017 Agreement.

The 2019 Agreement also incorporated the Joint Production Agreement Policy (the "Joint Production Policy") with respect to the 173-035 Accounts and the Joint Production Policy was attached to the 2019 Agreement. Compl. Ex. C, at 9. The Joint Production Policy included additional terms concerning confidentiality and non-solicitation. Compl. Ex. C, at 11. Under the Joint Production Agreement, Sayler agreed that

> [A]ll files, papers, memoranda, letters, facsimile, electronic or other communication whether original, duplicated, computerized, memorized, handwritten or in any other form, and all information derived therefrom relating to the business of Morgan Stanley, including but not limited to the names, addresses, telephone, email or any other identifying numbers and financial information of any Client Accounts (hereinafter collectively "Confidential and Proprietary Information and Records") are confidential and the sole and exclusive property of Morgan Stanley. Each Joint Producer agrees and understands that Confidential and Proprietary Information and Records whether provided to him or her by Morgan Stanley or by Client Accounts is entrusted to Joint Producer as an employee and representative of Morgan Stanley. Each Joint Producer agrees that the Confidential and Proprietary Information and Records in his or her possession are and remain the property of Morgan

> Stanley and, as such, are not to be removed from or used outside of any Morgan Stanley offices except as authorized by Morgan Stanley. In addition, each Joint Producer agrees to return immediately all Confidential and Proprietary Information and Records in his or her possession or control should his or her employment terminates [sic] for any reason and at any time. Each Joint Producer further agrees not to divulge or disclose Confidential and Proprietary Information and Records or any other confidential information relating to any other client to any person or entity outside Morgan Stanley including but not limited to a competitor of Morgan Stanley either during my employment or at any time thereafter.
>
> In addition, for a period of one (1) year following any Joint Producer's termination of employment for any reason, each departing Joint Producer agrees not to solicit any Client Accounts or retain any information regarding any such Client Accounts, including, but not limited to, a list of Morgan Stanley client names and/or client contact information. For purposes of this provision, the term "solicit" includes initiation of any contact with clients for the purpose of conducting business with or transferring accounts to any other person or firm that does business in any line of business in which Morgan Stanley or any of its affiliates is engaged. Each Joint Producer understands and agrees that the above referenced confidentiality and non-solicitation restrictions will survive termination of the JP Arrangement.

Compl. Ex. C, at 11-12.

A further term of the Joint Production Agreement provides that "Client Accounts and client information of whatever kind and in whatever form are and remain Firm assets and do not belong to any one or more Joint Producer(s) individually or jointly, or to any JP Arrangement." Compl. Ex. C, at 14.

After leaving the Group, Sayler received permission to send out "Thank You" cards to over 60 of his Morgan Stanley clients. The "Thank You" cards read "Thank you for your trust and confidence over the years; I do appreciate it! I enjoy working with you, and look forward to the years to come." Compl. Ex. D. A copy of Sayler's Morgan Stanley business card was included in the card. Morgan Stanley alleges that

Page 6 – OPINION AND ORDER

Sayler concealed his plan to resign from Morgan Stanley before receiving permission to send out the "Thank You" cards. Sayler asserts that he sent out the "Thank You" cards with the approval of Ray Cox, the Morgan Stanley Medford Branch Manager, and that he was not advancing any hidden agenda in sending out the cards. Sayler Decl. Morgan Stanley maintains that it would not have approved of the "Thank You" cards if it knew Sayler intended to resign shortly after they were sent out. Cox. Decl.

On June 13, 2019, Sayler resigned from his position with Morgan Stanley and took a position as a financial advisor with the Medford office of UBS Financial Services, Inc. ("UBS"). In the days before his resignation, Sayler printed over 170 pages worth of Morgan Stanley documents, which Morgan Stanley believes included client information that Sayler took with him when he departed. Cox Decl. Sayler maintains that these documents were print-outs of research on the portfolio of equities held by the Group and that printing those documents and delivering them to one of the other Group members were part of his regular duties. Sayler Decl. Cox, the Medford Branch Manager for Morgan Stanley, has submitted printer logs showing that Sayler printed an additional twenty pages from his calendar three days before he resigned and that he printed a thirteen-page spreadsheet of all the clients he serviced at Morgan Stanley as of May 29, 2019, sorted by the amount of assets in each account. Second Cox. Decl. Cox affirms that there was no reason for Sayler to print those documents shortly before he departed and Cox was not aware that any of those documents were returned to Morgan Stanley. *Id.* Sayler denies that he took any documents from Morgan Stanley. Sayler Decl.

In the days following Sayler's resignation, Morgan Stanley financial advisors began contacting Sayler's clients to inform them of Sayler's departure. Sevcik Decl.; Smith Decl.; Stone Decl. The advisors learned that Sayler had already contacted the clients in question and asked them to transfer their accounts to UBS. *Id.* Some of the comments made by the clients led the advisors to believe that Sayler had solicited them to follow him to UBS before he resigned from Morgan Stanley. Sevcik Decl. One client was contacted "almost immediately" after Sayler resigned and indicated that he was already aware of Sayler's departure and was considering whether to remain with Morgan Stanley or follow Sayler. Stone Decl. The specific clients are not identified, but the Morgan Stanley advisors all believed that Sayler's solicitation of former clients was a violation of the 2017 Agreement and the 2019 Agreement. Sevcik Decl.; Smith Decl.; Stone Decl. Sayler denies that he solicited any of Maddux's former clients. Sayler Decl. Sayler affirms that many of his Morgan Stanley clients sought him out and asked that he continue to service their accounts. *Id.*

On July 9, 2019, Morgan Stanley filed this action and a motion for TRO. ECF Nos. 1, 2. On July 10, 2019, this Court issued a TRO enjoining Sayler from using any confidential Morgan Stanley client information and directing Sayler to return any confidential client information in his possession to Morgan Stanley. Sayler was also enjoined from directly soliciting any Morgan Stanley clients covered by the 2017 and 2019 Agreements, although he was permitted to accept and service any Morgan Stanley clients who sought out or requested his services.

The issuance of the TRO triggered an accelerated arbitration schedule. At oral argument on the preliminary injunction, counsel advised the Court that this matter was scheduled for FINRA arbitration beginning on July 24, 2019.

DISCUSSION

I. Success on the Merits

In order to prevail on a motion for preliminary injunction, the plaintiff must demonstrate a likelihood of success on the merits or, at the very least, "serious questions" going to the merits of the case. *Cottrell*, 632 F.3d at 1131-32. In this case, Morgan Stanley alleges a claim for breach of contract based on Sayler's alleged violation of the 2017 Agreement and the 2019 Agreement, as well as claims for breach of fiduciary duty, unfair competition, tortious interference with business expectancies, and misappropriation.

Courts within this District have found that an alleged violation of limited non-solicitation clauses similar to those contained within the 2017 and 2019 Agreements can sustain a claim for breach of contract, when considered in the context of a preliminary injunction. *Brinton Bus. Ventures, Inc. v. Searle*, 248 F. Supp.3d 1029, 1038-39 (D. Or. 2017); *Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp.3d 1219, 1223, 1228 (D. Or. 2016).

In this case, there is a stark disagreement over the scope of those Agreements and over Sayler's conduct before and after his resignation. All parties appear to agree that they forbid Sayler from removing or retaining client information from accounts previously serviced by Maddux. Sayler denies that he has retained any such

information and further asserts that he serviced only a fraction of the Maddux accounts during his time with Morgan Stanley. Sayler Decl.

Morgan Stanley argues that the Agreements, and particularly the Joint Production Agreement incorporated into the 2019 Agreement, covered all the 173-035 Accounts. Those accounts, Morgan Stanley contends, constituted a substantial portion of the accounts Sayler serviced with Morgan Stanley. Second Cox. Decl.

The Court notes that, although he denies taking documents or soliciting former Maddux clients, Sayler does not clearly deny that he retained Morgan Stanley client information, nor does he clearly deny that he has solicited his clients to transfer their accounts to UBS. With respect to the former Maddux clients, Sayler's declaration is contradicted by the declarations of his former Morgan Stanley colleagues, who affirm that they have spoken with clients solicited by Sayler, both before and after his departure, and that they believe those solicitations to have been in violation of the FAP Agreements.

Precisely what, if any, client information Sayler retained, and which clients he solicited remains an open and unresolved question. The Court is not in a position to resolve that factual issue, nor is such a resolution necessary. *See, e.g., Fidelity Brokerage Servs. LLC v. McNamara*, No. 11 CV 1092 MMA (RBB), 2011 WL 2117546, at *2 (S.D. Cal. May 27, 2011) ("Moreover, on application for injunctive relief the court need not decide disputed questions of fact."). On this record, the Court concludes that there are "serious questions," with respect to Morgan Stanley's claims.

## II. Irreparable Harm

The parties also dispute whether the solicitation of Morgan Stanley clients constitutes an irreparable harm. "[I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury. . . The key word in this consideration is *irreparable*." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (internal quotation marks and citation omitted, emphasis added). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.* (internal quotation marks and citation omitted).

Here, Morgan Stanley has failed to sufficiently allege the existence of irreparable harm. Morgan Stanley alleges the loss of client relationships and company goodwill as the harms at issue. But in subsequent filings and at the hearing held on July 19th Morgan Stanley has failed to explain why any harm will be irreparable or why money damages would be insufficient. Considering the evidence before the Court, it's unclear how Morgan Stanley's allegations of irreparable harm rise to the level of a "clear showing" of "likely" irreparable harm as opposed to mere speculation about the possibility of Morgan Stanley suffering such a harm absent an injunction. *See Winter*, 555 U.S. at 22. In fact, the FAP Agreements suggest that Morgan Stanley is perfectly capable of calculating damages resulting from a violation of the non-solicitation and confidentiality clauses. *See* Comp. Ex. C at 24-25 (calculating damages for violation as 250% of the total amount of commissions and fees generated from the relevant client assets during the preceding 12-month period).

While courts are divided on the question of whether the loss of financial advisor client accounts constitutes an irreparable harm, even courts that have found irreparable harm have generally done so after the party requesting an injunction has met its burden of a clear showing of likely irreparable harm. *See, e.g., JP Morgan Secs. LLC v. Krich*, No. CV-15-00979-PHX-DGC, 2015 WL 3604199, at *4 (D. Ariz. June 8, 2015) (finding that an employer had sufficiently alleged a likelihood of irreparable harm when a former employee violated a non-solicitation agreement, managed $96 million over 470 accounts, and it would likely be impossible to determine accurately how much future business the employer would lose). In this case, by contrast, Morgan Stanley has not put forward any evidence indicating that that the harm to its business relationships and goodwill would be beyond repair or not sufficiently compensable with damages. While the Court acknowledges that the possibility of irreparable harm may exist, as it would in every case where a former employee leaves and violates confidentiality or non-solicitation clauses, Morgan Stanley has not provided evidence that would rise to the level of a clear showing that it is in fact likely to suffer the kind of harm that warrants "an extraordinary and drastic remedy" such as a preliminary injunction, *i.e.*, harm that is irreparable and not compensable through money damages. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

Additionally, "[c]ourts have become disinclined to find irreparable, incalculable harm from financial advisors' departures." *Barney v. Burrow*, 558 F. Supp. 2d 1066, 1083 (E.D. Cal. 2008); *see also Morgan Stanley v. Frisby*, 163 F. Supp.2d 1371, 1376

(N.D. Ga. 2001) (noting that the securities industry is highly regulated and each individual transaction is monitored electronically, as is every customer transfer, and so any financial loss is calculable). On the present record, and without more information about the client accounts being solicited or harm done to Morgan Stanley's reputation and relationship with those clients, the Court cannot justify keeping an injunction in place. If Sayler is found to have violated the 2017 and 2019 Agreements by soliciting covered client accounts, the loss to Morgan Stanley is likely more financial than reputational. Such harms can be redressed by damages, as is contemplated by the Agreements themselves and are not, therefore, irreparable.

### III. Balance of Equities and the Public Interest

Based on the limited and undeveloped record presently before the Court, there is evidence that Sayler has retained at least some Morgan Stanley client information and has actively solicited Morgan Stanley clients. Whether either act was in violation of the 2017 or 2019 Agreement remains to be seen.

In considering the equities, the Court is aware that Morgan Stanley is a substantial player in its market. In *Barney v. Burrow*, the court observed that "Brokerage firms can survive the denial of an injunction far more readily than their departing employees can survive its issuance." *Barney*, 558 F. Supp.2d at 1083 (citing *Frisby*, 163 F. Supp.2d at 1381). The Court notes, however, that this case is factually distinct from the situation in *Barney*, where the departing advisors formed their own start-up firm and might have been driven out of business by the injunction. *Id.* at 1084. Sayler, by contrast, has taken a position with UBS, an established and not-

insubstantial competitor of Morgan Stanley. Unlike the start-up firm in *Barney*, there is little risk of UBS being driven out of business by the requested injunction, or that Sayler would be put out of work by the injunction.

Furthermore, the TRO issued in this case required Sayler to surrender any Morgan Stanley client information in his possession and to refrain from actively soliciting Morgan Stanley customers. It did not forbid Sayler from working as a financial advisor, nor did it prevent him from servicing any Morgan Stanley customers he solicited before the TRO was issued, or from servicing the accounts of any Morgan Stanley customer who requested his services. On this record, the Court finds that the balance of equities weighs in favor of Morgan Stanley.

With respect to the public interest, "Oregon law reflects a balancing of competing policies: 'The freedom to pursue one's chosen occupation is in tension with freedom of contract, and the advocate of competition must grapple with the argument that noncompete agreements are economically advantageous because they protect costly investments.'" *Searle*, 248 F. Supp.3d at 1039-40 (quoting *Ocean Beauty Seafoods, LLC v. Pac. Seafood Grp. Acquisitions Co., Inc.*, 648 F. App'x 709, 711-12 (9th Cir. 2016)). This case reflects that tension and, as in *Searle*, this Court concludes that the public interest does not strongly favor either side.

\ \ \

\ \ \

\ \ \

\ \ \

## CONCLUSION

On this record, the Court concludes that there are serious questions going to the merits of this case and the balance of equities tips slightly in Morgan Stanley's favor. However, Morgan Stanley has failed to clearly establish that it will suffer irreparable harm in the absence of further injunctive relief. Accordingly, the motion for continuing injunctive relief is DENIED and the previously issued injunction is dissolved.

It is so ORDERED.

Dated this 31st day of July, 2019.

*Ann Aiken*
Ann Aiken
United States District Judge